

Potomac Law Group, PLLC
1177 Avenue of the Americas, 5th Floor
New York, NY 10036
Telephone: (646) 519-7477
Fax: (202) 318-7707

April 28, 2025

Hon. Catherine O'Hagan Wolfe
Clerk of Court
United States Court of Appeals for
  the Second Circuit
40 Foley Square
New York, NY 10007

    Re:  Violette Jeannot et al. v. James V. McDonald (No. 25-314)
          <u>Reply in Support of Motion for Emergency Reconsideration of Injunction Pending Appeal</u>

Dear Ms. Wolfe:

    As counsel for Plaintiffs-Appellants in the above-referenced appeal, we write in reply to Defendant-Appellee James V. McDonald's filing in opposition (Dkt. 31) to Plaintiffs-Appellants' emergency motion for reconsideration (Dkt. 30).

    Defendant-Appellee asserts that a motion for reconsideration is not a vehicle for relitigating issues the Court has already decided, and he argues that no new evidence warrants reconsideration. Dkt. 31 at 2. We agree that a motion for reconsideration is not a vehicle to relitigate issues already presented to the Court, and therefore Plaintiffs-Appellants identified three new and substantial issues that came to light following the parties' briefing on Plaintiffs-Appellants' motion for injunction pending appeal.[1]

---

[1] This Court's decision dated March 25, 2025 (Dkt. 21) denying Appellants' motion for injunction pending appeal did not provide any reasoning or explanation, but rather just stated that the Appellants had not met the requisite standard for their request. Thus, a motion for reconsideration is particularly appropriate here as it is unclear which element(s) (e.g., likelihood of success on the merits, irreparable harm, public interest) this Court found lacking, and the new evidence before the Court may ultimately change the Court's decision.

1

1. **Defendant-Appellee's Submission to the U.S. Centers for Medicare and Medicaid Services ("CMS")**

As Plaintiffs-Appellants explained in their motion, Defendant-Appellee's submission to CMS after the date of this Court's decision is highly relevant for at least two reasons. First, a core aspect of Plaintiffs-Appellants' legal argument is that federal approval is required prior to the removal of all choice available to a Medicaid beneficiary to select his or her agency-provider in New York's Consumer Directed Personal Assistance Program ("CDPAP"). Defendant-Appellee indisputably has not obtained such approval. His argument throughout this litigation has been that no such federal permission is required because he asserts that Fiscal Intermediaries ("FIs") do not provide medical assistance. Yet, following this Court's decision on March 25, Defendant-Appellee sought permission from the federal government to eliminate language in New York's state plan permitting the free choice of an FI—approval he previously said was not needed.

CMS has 90 days to review this request, and if it agrees with Plaintiffs-Appellants that such approval may not be granted without a Section 1915(b)(4) Waiver Application, and requisite approval from the Secretary of the U.S. Department of Health and Human Services ("HHS"), then it will reject Defendant-Appellee's request to amend the state plan, as submitted. At a minimum, this warrants a temporary injunction pending CMS's review of this new request by Defendant-Appellee, and certainly constitutes new evidence that has developed after this Court's decision.

Second, Defendant-Appellee's submission to CMS seeking approval to eliminate choice of FI in New York's state plan, despite his prior representations that no approval was necessary, raises continued questions regarding the New York State Department of Health's ("DOH") veracity with the public, and the courts. DOH Medicaid Director Bassiri swore under oath that he "contacted CMS and was assured that CMS does not require DOH to submit a SPA for this transition." JA282, ¶ 35. Despite this representation to the court, Defendant-Appellee has never provided any details of this purported communication—let alone proof of it occurring—which presumably would have been helpful to his argument in the litigation and therefore provided. Now, the very agency that represents CMS in litigation has expressed concerns regarding the truthfulness of multiple representations made by DOH regarding the transition to Public Partnerships LLP ("PPL"). Given that Defendant-Appellee has now taken action inconsistent with prior representations by submitting a request for approval to CMS, along with the United States' concerns about DOH's truthfulness concerning the transition to PPL, this Court should require Defendant-Appellee to file proof of the communication in which CMS purportedly informed DOH that federal approval was not needed for the transition to PPL.

In addition, Defendant-Appellee has not opposed Plaintiffs-Appellants' request that this Court petition the United States to exercise its authority under 28 U.S.C. § 517 and submit its position as to whether New York's transition to PPL without first obtaining federal approval violates federal law. Plaintiffs-Appellants again respectfully request that this Court obtain the formal position of HHS on this issue prior to making a decision on Plaintiffs-Appellants' motion for reconsideration.

### 2. Irreparable Harm Following Denial of Injunction Pending Appeal

Remarkably, although Plaintiffs-Appellants submitted declarations from three Consumer-Appellants detailing their inability to obtain medical assistance through PPL, Defendant-Appellee argues that they have not been harmed because they have not stated that their personal assistants ("PAs") "have stopped showing up for work and providing care" and because "often family members or friends of the consumer" provide care, so they can continue showing up for work without pay, hoping to get paid at some later date. Dkt. 31 at 2-3. Defendant-Appellee further argues that all three of these Consumer-Appellants are now registered with PPL, and the PAs of two of the three are registered with PPL. *Id*. at 3, n.2. Defendant-Appellee also claims that 85% of consumers had completed their registration with PPL (or switched programs). *Id*. at 3.

First, these consumers are authorized to receive personal care services through the CDPAP, in which their PAs receive payment for those services. That friends or family may, in some cases, fill a gap created by Defendant-Appellee's inept transition, does not mean that those consumers are not suffering irreparable harm from losing their actual covered and paid services. Additionally, many PAs are not friends or family, nor will all friends and family be willing or able to work for free. *See* Decl. of Trina-Rose Cutugno dated April 28, 2025 ("Cutugno Decl."), Ex. A ¶¶ 6-8.

Second, Defendant-Appellee's response acknowledges that Ms. Francois's caregiver is not yet registered with PPL and thus unable to receive payment for any services provided to Ms. Francois. Dtk. 31 at 3, n.2. This alone shows irreparable harm is occurring, by Defendant-Appellee's own admission. Moreover, Ms. Francois's struggles have only continued after the declaration she submitted on April 11 (Dkt. 30, Ex. D). Since then, and despite continued efforts, her PA has been unable to register with PPL and he now has gone 28 days without any pay. *See* Decl. of Yvonne Francois dated April 28, 2025 ("Francois Decl."), Ex. B ¶ 3. Last Tuesday, Ms. Francois's PA walked off the job out of frustration from not receiving any payment. *Id*. ¶ 4. That day, Ms. Francois attempted to walk by herself to her clubhouse, but she fell because of her medical condition, and she hit her head. *Id*. ¶ 5. She has called her case manager at her insurer for help, but they claim to be unable to help her. *Id*. ¶ 6. Without immediate injunctive relief, Ms. Francois is at risk of additional injury and harm.

Further, although Defendant-Appellee claims that the other two declarants (Trina-Rose Cutugno and Rashida Smith) and their PAs are now registered with PPL and can get paid by PPL, only recently did this occur and not without continued issues. Ms. Smith reports that her PA finally received pay within the last several days, although it is unclear if she has been properly paid. Likewise, Ms. Cutugno's PAs finally received some payment days ago, after waiting nearly a month, but even those payments are rife with issues like incorrect deductions, incorrect amounts, and some time still unpaid. Cutugno Decl. ¶ 5.

Third, Defendant-Appellee claims that 85% of consumers have completed their registration with PPL (or switched to a different Medicaid home care program), as a suggestion that harm is not occurring, and the transition is going well. Dkt. 31 at 3. As a preliminary matter, Defendant-Appellee's statement does not accurately reflect the current

status because the very press release he cites says that at least 85% of consumers have "started or completed" registration, not just completed, which is a meaningful difference. Further, given the lack of transparency by DOH and PPL, it is hard to discern the true state of affairs. *Id*. (citing https://www.health.ny.gov/press/releases/2025/2025-04-04_cdpap_update.htm).

At any rate, consumer registration is not the benchmark because, for services to be received, the consumer's PA must also be employed by PPL and able to receive payment from PPL for the services provided, a process that is full of hurdles. *See* Cutugno Decl. ¶¶ 4-5, 10; Francois Decl. ¶ 3. PPL stated on April 18 that more than 130,000 PAs were paid during the second week of its statewide payroll. *See* https://pplfirst.com/news/ppl-issues-payments-to-more-than-130000-cdpap-caregivers/. But DOH itself estimated that more than 300,000 PAs provide care under the CDPAP. JA282, ¶ 24. Thus, **_more than half of PAs are still not being paid_** as a result of the forced transition, and an untold number of them have understandably walked off of the job, leaving consumers without any assistance. Ms. Francois is just one example. Every day that goes by without a full and complete injunction to the forced transition to PPL hurts elderly and disabled Medicaid beneficiaries, including the Plaintiffs-Appellants.

### 3. Statement of Interest by the United States of America

Defendant-Appellee seeks to downplay the significance of the United States of America's statement of interest in the *Engesser* case, claiming it is "a short statement of interest" and one that is "baseless because DOH's assurance that consumers would get to choose personal assistants and retain CDPAP authorization for services are in fact true." Dkt. 31, at 5.

The United States of America's statement of interest, however, is quite significant and its concerns are not baseless. The United States wrote that it "shares Plaintiffs' significant concerns regarding the integrity and viability of the CDPAP transition." Dkt. 30, Ex. H, at 3. The United States noted that consumers who "face informational, medical, educational and language barriers" are bearing the burden of navigating enrollment for them and their PAs with PPL to avoid losing services. *Id*. It expressed concern that "this transition process has burdened vulnerable CDPAP patients and threatened their ability to maintain critical care." *Id*. The United States also expressed its concern with DOH's compliance with the Court's injunctive relief. *Id*.

Additionally, the United States stated that its concern "extends to the veracity of representations and assurances made by key drivers of the transition in communications to CDPAP patients, their PAs, and the public." *Id*. at 4. The United States noted that DOH's representations regarding continued care, including easier pay for caregivers, and "better care and better service at a better price" are not matching the reality on the ground, and this "suggests that vulnerable CDPAP patients and their caregivers may have been misled by formal and informal representations and omissions regarding the mechanisms of the CDPAP transition and the corresponding effect on their healthcare." *Id*. at 5. The statistics bear this out. As mentioned above, with **_more than half_** of caregivers not receiving any payment whatsoever from PPL for weeks, it is hard to see how Defendant-Appellee's representations

about the transition have been accurate.

      Plaintiffs-Appellants ask this Court to reconsider its decision denying an injunction pending appeal, given the arguments set forth in Plaintiffs-Appellants' motion, and the new evidence that has come to light following the Court's March 25 decision.

      Sincerely,

      /s/ Derek Adams
      Derek M. Adams
      Susan B. Hendrix

      *Counsel for Plaintiffs-Appellants*

Word count: 1834

# EXHIBIT A

# 25-314

_____

**UNITED STATES COURT OF APPEALS
FOR THE
SECOND CIRCUIT**
_____

Violette Jeannot, Yvonne Francois, Antonina Frimer, Pedro Peralta, Trina-Rose Cutugno, Elizabeth Dunrod, Zilla Cummings, Charlotte Dewitt, Rashida Smith, Nikolay Gavrilov, Cesar Riofrio
*Plaintiffs-Appellants,*

Eugene Karasyunok, Nelli Kotsyuba, Vitaliy Rozenboym, Margarita Rozenboym, Muhammad O. Islam, Carol Gittens, Naum Galler, Aasha Services, Inc., Bangla CDPAP Service Inc., Best Help Home Care Corp., Careaide Direct, Inc., Carefirst CDPAP, Corp., Celestial Care Inc., Easy Choice Agency, Inc., Elim Home Care Agency LLC, Enriched Home Care Agency Inc., Healthy Life Choice Inc., Home Choice LLC, The Doral Investors Group, LLC, DBA House Calls Homecare, International Home Care Services of NY, LLC, Just Care LLC, Safe Haven Home Care, Inc., Safety 1st Homecare, Inc., Silver Lining Homecare Agency, Inc., Sundance Home Care Inc., Allcare Homecare Agency, Inc, DBA Vivid Care,
*Plaintiffs*
v.

James V. McDonald, in his official capacity as
Commissioner of the New York State Department of Health
*Defendant-Appellee,*

New York State, New York State Department of Health, Kathy Hochul, in her official capacity as Governor of New York.
*Defendants.*
_____

On Appeal from the United States District Court for the
Eastern District of New York

**DECLARATION OF TRINA-ROSE CUTUGNO**

1

1. My name is Trina-Rose Cutugno and I am competent to make this Declaration. I have personal knowledge of the matters set forth in this Declaration.

2. As I mentioned in my prior declaration in support of the motion for reconsideration (Dkt. 30, Ex. C), I am also an advocate who is fairly informed about what has been happening with the CDPAP transition and follows developments as closely as I can.

3. In the Commissioner's letter-opposition filed on April 21, 2025 (Dkt. 31), the Commissioner asserted that I and my three personal assistants ("PAs") are fully registered with PPL and the registered PAs "can therefore submit timesheets and be paid by the statewide fiscal intermediary." Opp'n at p. 3 n.2.

4. To clarify, in PPL's portal, "Paperwork Complete" does not mean payroll ready. PPL tells PAs that, at the "Paperwork Complete" stage, they need to keep checking the "To-do" list for any to-do items. For example, one of my PAs who was listed as "Paperwork Complete" then got a request this past weekend to complete demographic information.

5. One of my three PAs was only just paid on April 18th but the paycheck did not accurately reflect the hours worked and is missing 12 hours, underpaying by $261.30. He did not yet get another check even though he worked consistently since April 1st at 24 hours per week. Another one my PAs

2

was paid around April 24, 2025, but PPL incorrectly had him enrolled in the MEC/Flex benefit, a program which he opted out of through a waiver by 2 different methods earlier: an email to PPL HR and Uploading the Waiver form and supporting documents to his PA PPL portal. My third PA's issue relates to Direct Deposit issues and payment. She received a call from PPL on Wednesday, April 16 saying that the account number for her Direct Deposit paperwork that she submitted was incorrect. That does not make sense because we uploaded a copy of a voided paper check, so the account number and routing numbers should have been verifiable. She was paid with a paper check for one pay period, but she should have been paid for two pay periods. She has not yet received a second paper check. In addition, PPL has not yet resolved the issue with her direct deposit account numbers. PPL was supposed to call her to get this resolved last week and did not.

    6. The Commissioner cavalierly suggests that not being paid on time is not a problem because PAs "are often family members or friends of the consumer." Opp'n at 3. The Commissioner seems to be saying that it ok not to pay PAs timely because they are family or friends who would show up anyway, regardless of the failure to pay for their services.

    7. None of my PAs are family members. I am not related to any of my PAs. One of my PAs happened to be a Personal Care Attendant from when I

3

received services through a traditional home care agency who switched to become a CDPAP PA working with me when I enrolled in the CDPAP approximately 15 years ago. I found another PA by inquiring with my formal networks, word of mouth, postings and asking acquaintances if they knew of anyone seeking work who I could train to help support my needs including ADLs and Instrumental activities of daily living.

    8. To clarify, none of my PAs are family members. None are friends and none are folks who were providing "care" or services prior to my hiring them for the job. In short, my PAs were **never** 'informal supports', family or friends of mine who ever provided care for free, voluntarily who eventually "became compensated" through the CDPAP, as the Governor seems to think is the only scenario for CDPAP participants. I turned to CDPAP after years receiving traditional home care services and finding that the traditional was not the best fit for my needs. I switched to the CDPAP, received an approved number of hours per week through the local district of social services and then sought out PAs to fill the needed hours for my care.

    9. I find it presumptuous that the Commissioner assumes that my three current PAs are the same ones that I had with my former FI and that I didn't need to replace any one of my PAs because the DOH's Q&As published during the RFP# 20524 process indicated that DOH did not even have information on

4

how many PAs there were in the CDPAP, nor what the "turnover rate for Personal Assistants in the CDPAP program" actually is. See, e.g., Q.94 and Q.95, at https://www.health.ny.gov/funding/rfp/20524/qanda.pdf (Q: "*How many personal assistants are currently providing services through CDPAP?*"; **A: "The Department does not have this information"** and "*Q: What is the average turnover rate for personal assistants in the CDPAP program?*"; **A: "The Department does not have this information"**).

10. If any PAs carried over to the new FI with me, it would have been because of my own efforts, negotiations, and loyalties. Because a consumer in CDPAP is responsible for maintaining continuity of care for our authorized hours, I could get kicked out of the CDPAP if I could not find the number of PAs to fulfill all of my authorized hours. I even showed all PAs the Commissioner's video promising that using PPL would make "getting paid easier". See https://www.youtube.com/watch?v=UOKgww5Kh_w. Despite his assurances, it has not been easy. If any PAs carried over to the new FI with me, it would have been because of my own efforts, negotiations, and loyalties – not because of any transitional efforts on behalf of NYS or DOH, or any local district of social services. All *"continuity of care" (if there is any at all)* in transitions from one FI to another are handled individually and intimately by consumers, families, designated Representatives and each of our PAs. We

5

cannot afford to have our fragile relationships complicated with more complex administrative barriers and our ability to remain in and participate in Consumer Directed home care programs frustrated by these changes, disruptions and gaps.

11. As I mentioned in an earlier declaration in support of the motion for reconsideration (Dkt. 30, Ex. C), my brother is also a CDPAP consumer. Unfortunately, there are issues with his PAs being paid incorrectly and missing dates of service on their pay stubs, using the Time4Care app and PPL's telephony system, and those PAs are now seeking redress through the courts under recent litigation under the Fair Labor Standards Act.

12. Under this new single statewide FI structure, **the state took away our home care agencies.** The state also took away the **supports** we were receiving from our former FIs and completely changed the model of consumer-direction in New York's home care system. **The burden will now fall on us consumers and designated representatives to maintain *any* kind of continuity of care.** The move to a single FI frustrates our ability to even remain in CDPAP because we cannot even choose amongst different providers to offer our PAs competitive wages, benefits, etc. to, and quite frankly, for such low wages in the home care sector in the first place, we consumers/families are dealing with fragile relationships that cannot withstand more instability/disruption.

13. This "new model" of CDPAP seems to me to be suited for states that use a "budget authority" in their Community First Choice Option ("CFCO") programs or Waiver programs, but that is not the way New York State has ever done CDPAP! It is also not approved by CMS to implement a "budget authority" model in CDPAP under CFCO and has not sought waivers nor a State Plan Amendment to the NYS Medicaid Plan to implement a "budget authority" in the way in which PPL is deducting my authorized hours within the PPL account system.

I declare under penalty of perjury that the foregoing is true and correct. Executed on April 28, 2025.

*[signature]*
Trina-Rose Cutugno

# EXHIBIT B

# 25-314

## UNITED STATES COURT OF APPEALS
## FOR THE
## SECOND CIRCUIT

Violette Jeannot, Yvonne Francois, Antonina Frimer, Pedro Peralta, Trina-Rose Cutugno, Elizabeth Dunrod, Zilla Cummings, Charlotte Dewitt, Rashida Smith, Nikolay Gavrilov, Cesar Riofrio
*Plaintiffs-Appellants,*

Eugene Karasyunok, Nelli Kotsyuba, Vitaliy Rozenboym, Margarita Rozenboym, Muhammad O. Islam, Carol Gittens, Naum Galler, Aasha Services, Inc., Bangla CDPAP Service Inc., Best Help Home Care Corp., Careaide Direct, Inc., Carefirst CDPAP, Corp., Celestial Care Inc., Easy Choice Agency, Inc., Elim Home Care Agency LLC, Enriched Home Care Agency Inc., Healthy Life Choice Inc., Home Choice LLC, The Doral Investors Group, LLC, DBA House Calls Homecare, International Home Care Services of NY, LLC, Just Care LLC, Safe Haven Home Care, Inc., Safety 1st Homecare, Inc., Silver Lining Homecare Agency, Inc., Sundance Home Care Inc., Allcare Homecare Agency, Inc, DBA Vivid Care,
*Plaintiffs*
v.

James V. McDonald, in his official capacity as
Commissioner of the New York State Department of Health
*Defendant-Appellee,*

New York State, New York State Department of Health, Kathy Hochul, in her official capacity as Governor of New York.
*Defendants.*

On Appeal from the United States District Court for the
Eastern District of New York

**DECLARATION OF YVONNE FRANCOIS**

1. My name is Yvonne Francois and I am competent to make this Declaration. I have personal knowledge of the matters set forth in this Declaration.

2. I previously submitted a declaration to this Court on April 11 detailing the problems that me and my Personal Assistant ("PA") have had getting registered with Public Partnerships LLC ("PPL") for my services under New York's Consumer Directed Personal Assistance Program ("CDPAP").

3. Since April 11, the problems have not been resolved. My PA and his daughter have continued to try and get registered with PPL, but they keep telling him that his forms are not right, although they do not explain to him what is wrong. He and his daughter keep trying to register but are unable to. He also tried to respond to a PPL email address and received a bounce back rejection saying that PPL's email address was not even valid.

4. He got so angry for not being paid that on Tuesday of this week, he said he was not going to keep showing up without any pay and he left.

5. That day, I tried to walk by myself to my complex's clubhouse, but I fell because of my vertigo and I hit my head. It has caused me a lot of pain and I went to see my doctor.

6. I also called my case manager at Centers Plan and told her that I hit my head. She is very nice but said there is nothing they can do to help right now.

7. After I fell on Tuesday, my PA came back to help me because he cares about me and is my nephew. But he cannot and will not keep working for free.

8. I need help. This is horrible what is happening. Why are my rights to select my agency being taken away? Please do something about this and stop it.

I declare under penalty of perjury that the foregoing is true and correct. Executed on April 28, 2025.

Yvonne Francois

3